## In Re Estate of Albert G. Beaunisne, deceased. Appeal of Mary K. Beaunisne, Administratrix, Appellant, v. Robert A. Scholz, Appellee.

### Gen. No. 17,743.

1. CORPORATIONS, § 27*—*when a person is promoter rather than a subscriber or vendee of stock.* Evidence *held* to show that a subscriber to stock was a fellow-adventurer in a speculative enterprize, viz., the building of a railroad in a foreign country, and that such subscriber knew or should have reasonably inferred from all the circumstances that his money was to be used in the preliminary work, the corporation not being definitely provided for.

2. EVIDENCE, § 330*—*when parol evidence is admissible.* Where a receipt stated that certain money was received as payment for stock in a corporation to be organized to own a certain railroad, extrinsic evidence was competent to show the real contract and its terms, such as when the stock was to be delivered.

3. CORPORATIONS, § 126*—*what must be considered in determining when stock must be tendered.* Where a business adventure, to establish a railroad in a foreign country, involved an issue of bonds and considerable preliminary work before the railroad corporation could be formed, *held* that all the circumstances connected with the development of the enterprise should be considered in determining whether stock in the corporation was tendered to a subscriber within a reasonable time.

4. CONTRACTS, § 297*—*what constitutes waiver of demand for performance.* A second demand for delivery of stock in a corporation, framed apparently on a different theory of the subscriber's rights, would waive and supersede the first demand.

5. CONTRACTS, § 299*—*what constitutes "reasonable time."* Held that three months was a reasonable time for tendering stock in a corporation, although a subscriber demanded delivery "forthwith."

Appeal from the Circuit Court of Cook county; the Hon. H. STERLING POMEROY, Judge, presiding. Heard in this court at the October term, 1911. Reversed and judgment here. Opinion filed October 13, 1913.

TOLMAN & REDFIELD, for appellants; EDGAR B. TOLMAN and HENRY P. CHANDLER, of counsel.

HENRY S. SHEDD, for appellee.

*See Illinois Notes Digest, Vols. XI to XIV, same topic and section number.

MR. JUSTICE BROWN delivered the opinion of the court.

The Probate Court of Cook county on February 6, 1909, allowed a claim of Robert A Scholz against the estate of Albert C. Beaunisne for $1,177.75, based on the following statement:

"April 2, 1908.

Estate of Albert G. Beaunisne, deceased,

To Robert A. Scholz, Dr.

To cash deposited with said deceased February 10, 1903, to be used in payment for stock to be subscribed for and issued to said Scholz in a corporation to be organized for the purpose of owning and operating a railroad from Port Yarbaros to Alamos in the State of Sonora, Mexico, and thence to San Bernado and Josefita Mineral in the same state under the concession granted for that purpose by the Government of the Republic of Mexico.                                    $1,000.

Interest on same from July 17, 1905, at 5% per annum.''

The administratrix of the estate appealed to the Circuit Court of Cook county, where the cause was tried *de novo* without a jury. A judgment was again entered in favor of the claimant on May 10, 1911, for $1,292. From this judgment the administratrix appealed to this court, assigning as error that the finding and judgment of the Circuit Court are contrary to the law and the evidence and that the court erred in refusing to hold certain propositions of law tendered by the administratrix.

The cause was tried in the Circuit Court on a stipulation as to the facts, supplemented by the testimony of A. P. Ballou, a business associate of the decedent, introduced by the defendant estate, and by the testimony of the claimant Scholz in his own behalf. This testimony was confined to the only question of fact which was in controversy, how far the business enterprise and the proposed plan of procedure in relation to it by those having it especially in charge were explained to Scholz before he invested the money in it, for which he

is now suing? This testimony we will comment on hereinafter.

The matter contained in the stipulation of facts is all material, but the stipulation is too long for quotation in full, and a recitation of it in its entirety is unnecessary for our purpose.

The claimant paid Albert G. Beaunisne one thousand dollars on February 10, 1903, and received from him the following writing:

"Chicago 2-10, 1903.

$1000. Received from Robert A. Scholz One Thousand Dollars as payment in full for an amount of stock of the par value of $5,000.00 in the corporation to be organized at a capitalization of not less than $5,000,000 par value, for the purpose of owning and operating a railroad from Port Yarbaros to Alamos in the State of Sonora, Mexico, and thence to San Bernardo and Josefita Mineral in the same State under the concession granted for that purpose by the Government of the Republic of Mexico.

Albert G. Beaunisne."

Scholz has never received the stock. July 10, 1905, he delivered to Beaunisne a written demand for the thousand dollars which he had paid, stating in the same that he withdrew his consent to subscribe for stock in the corporation described in the receipt of February 10, 1903, which he recited, and tendered to Beaunisne on payment of the thousand dollars.

To this demand Beaunisne replied that he would not return the thousand dollars and that he could not deliver to him the stock because the corporation had not been organized. August 1, 1906, Scholz made another written demand on Beaunisne, reciting as before the receipt of February 10, 1903, and concluding:

"Whereas said stock had never been delivered to me:

Now, therefore, I hereby demand that you deliver to me forthwith the said stock mentioned in the receipt or repay to me the said sum of One Thousand Dollars."

August 1, 1906, Beaunisne and associates filed in the office of the auditor of the territory of Arizona articles

of incorporation of the Southern Sonora & Alamos Railroad Company with an authorized capital of $5,-000,000.  August 23, 1906, Beaunisne and others who had obtained and held a concession from Mexico for the railroad conveyed to the corporation their rights under the concession and in certain real estate acquired for right-of-way purposes and in the deposit of $13,200 made with the Mexican Government to secure the performance of the concession contract.  The railroad corporation then entered into a contract with the Continental Construction Company for the construction of the railroad and its equipment, the amount of the contract being payable in bonds and stock of the railroad company.  On October 26, 1906, after these things were done Beaunisne tendered to Scholz shares of stock in said Southern Sonora and Alamos Railroad Company of the par value of five thousand dollars. Scholz refused to accept said shares.  They were, at the trials in the courts below, brought into court for the purpose of making the tender good.

Justification of the refusal seems by appellee to be put on two grounds:  First, that the tender was not made within a reasonable time either of the contract which it is contended was embodied in the original receipt, or even of the second demand, which either the stock or the money would have satisfied.  It is, however, also contended that the second demand (of August 1, 1906) did not as a matter of law waive or alter the rights accruing to Scholz to have his money returned to him which sprang from the original contract, the delay in fulfilling it, and his first demand of July 10, 1905.

The second justifying reason asserted by Scholz for refusing the tender is that he holds himself to have been an investor simply and not a promoter, and that the corporate enterprise was abandoned before the corporation was formed.  To substantiate the second branch of this proposition he cites the facts incor-

porated in the stipulation that an attempt to negotiate the underwriting and sale of bonds, the proceeds of which were to build the road, lasted through 1903, 1904 and a part of 1905, but was then abandoned; that all the money paid in to Beaunisne by Scholz and other persons similarly subscribing, about $30,000 in all, was expended before July 13, 1904, in this attempt and in securing a concession from the Mexican Government, and in making preliminary field surveys of the proposed road and obtaining right-of-way, and that the concession was terminated by the Mexican Government May 21, 1907, on account of the failure of the concessionaires to construct the first twenty kilometers of the railroad within the time prescribed by the concession contract, which extended only to April 20, 1907. Although an application for renewal of the concession was pending before the proper department of the Mexican Government for about six months, it was denied and the railroad described in the receipt was never constructed.

The defense of the estate to the claim is based on a different view of the facts above set forth as related to and connected with other circumstances.

That Scholz never actually received anything for his thousand dollars and that the stock would have been worthless in his hands had he accepted it in October, 1906, is conceded, but it is contended that Scholz was not a mere investor but stood (as did each of those subscribing to this enterprise) towards Beaunisne as an associate in a promoting and speculative enterprise; that Beaunisne was simply the treasurer of a committee of organization; that it was understood and agreed that the money contributed by the associates, including Scholz, was to "promote the success of a mining enterprise by the construction of a railroad," and that it was so used to the entire satisfaction of all legal or moral obligations of Beaunisne.

It is also contended that even if a stricter and a technical construction of Beaunisne's obligations is to be at-

tached to the transactions and the receipt of February 10, 1903, those obligations were fulfilled by the tender of October 26, 1906, that "a reasonable time" for the tender of the stock is not to be determined by the time that it might have taken to organize a corporation in Arizona and distribute certificates, but that there should be also taken into account "the grounds which led to the postponement of the organization of the Company, the absence of any damage to appellee from the decision not to organize earlier, and the recognition by the appellee in his second demand that a tender of the stock less than three months before it was actually tendered would have satisfied the agreement," and also "the speculative nature of the enterprise, the difficulties of procuring the funds necessary for the construction of the railroad in question, the decision of the promoters to postpone the incorporation until the persons subscribing such funds could be consulted in respect thereto, and all other circumstances connected with the development of the railroad enterprise as shown by the stipulation and evidence." Propositions of law tendered to the court, which mentioned these matters as proper for the court to consider in determining whether the stock was tendered within a reasonable time, were refused by it. The evidence presented by the defendant estate in furtherance of this view was the testimony of A. P. Ballou, hereafter referred to, and the following facts incorporated in the stipulation in addition to those already recited.

Before the money was paid to Beaunisne and the receipt given Scholz, Beaunisne and other persons owned shares of stock in the International Copper & Gold Company, an Arizona corporation which owned certain mines near Alamos, San Bernardo and Josefita Mineral. Transportation facilities to and from the mines were important to said Company and its financial success would be promoted by a railroad from the mines to the Pacific Ocean. For the promotion of the success of the mining enterprise Beaunisne, with Ballou,

DeGolyer and Freeman, three other stock-holders in the mining company, agreed to procure the construction of such a railroad. This "Committee of Organization" was to obtain a concession from the Mexican Government for the construction of the road, to make the preliminary surveys, to pay the deposit required by the Mexican Government and to organize a corporation which should take over said railroad concession and enter into a contract with some construction company to build the road and accept payment for construction in bonds of the railroad company, to be secured by a mortgage upon the railroad. As a special inducement to those who furnished the preliminary funds to carry the enterprise to a point when such a contract could be made and bonds issued secured by a mortgage, the Committee of Organization agreed that the stock of the corporation should be subsequently issued and delivered at twenty cents on the dollar to persons who should advance the money required to carry on the enterprise until the bonds were issued and sold, and that the money advanced should be used in the expense of obtaining said concession, making the preliminary surveys and doing the work necessary to be done before the construction contract could be entered into and the bonds issued, underwritten and sold.

Scholz paid his money to Beaunisne as treasurer of the Committee of Organization, and the relation of vendor and vendee was not created nor intended to be created by the payment and receipt of the money. The attempt to secure the sale and underwriting of the bonds of the proposed railroad company was made through one W. H. Norledge, whose expectation was to sell them on the English financial market. Norledge requested the Committee of Organization to postpone the formation of a corporation until he had secured the necessary financial arrangements in England for the underwriting and sale of such bonds in order that the persons furnishing the money for the purchase of the bonds might have the corporation organ-

ized under the laws of such state or country as they should prefer and with such charter and by-laws as should be agreeable to them. For this reason the organization of the corporation was delayed, although it would not have taken more than three weeks at any time to organize such a corporation under the laws of Arizona and issue stock.

The essential gist of the testimony of Ballou, hereinbefore referred to, was that Scholz was, as was the witness and as was Beaunisne, a stockholder in the International Copper & Gold Company; that he (Ballou) had at least three conversations with Scholz, in which the mining proposition and the desirabilty of a railroad in connection therewith and the plan of building one were discussed. Ballou testified:

"We wanted the view of the mining company's stockholders and we wanted to get the money with which to carry on the work, the preliminary work of organizing the company and placing it on a basis where it could undertake the work. We believe the bonds would be salable, because we believed there was a big opportunity for a railroad. We believed a railroad would be the means of following out our project, in fact it was almost necessary for the purpose of carrying on our mining project, and I advised him (Scholz) to sustain us in that project. I don't remember Mr. Scholz' reply, except that it covered a number of questions regarding the situation and our plan of operation. I remember that he inquired into it very carefully because he was always of an inquiring nature and liked to know the inside facts of things. * * * I remember stating that we did not intend organizing a company until we had reached the point where we could make some definite statement with regard to the bond issue for the reason that the capitalists whom we might interest in the project might have something to say with regard to which state the railroad company should be organized in, and therefore this preliminary plan was one whereby those who paid money into it would have a

substantial interest in the stock when the company was organized.''

Mr. Scholz denied that this full explanation was given him. He testified:

''I want to say he (Ballou) did not explain to me what this money was going to be used for at all; he simply mentioned that Mr. Beaunisne and a few other men had given money into it and started a railroad down there and were going to sell stock, and for me to get up the money and get in while the stock was low. * * * He (Ballou) said this is a good thing, that a railroad was to be organized, that it was a question of days when it would be placed; the stock would be placed on the market, and it would take a bound immediately. * * * This organization was not stated to me as it has been stated here; in other words, this was not organized, and I thought from my conversation with Mr. Ballou that if I put my money in and if I became dissatisfied within six months I could withdraw and it was within six months that I began to try to withdraw.''

On cross-examination he testified that he knew when he furnished the money that the corporation was not organized, but thought the road was in process of construction. He said: ''I thought they were pushing it from the Coast, pushing the survey. I know a railroad has to be surveyed before it is built and graded before the rails are laid.''

Aside from the question whether the tender of the stock in October, 1906, was a sufficient satisfaction of the obligation incurred by Beaunisne and expressed in his receipt, the position of the appellee in regard to the theory of the defense is that as the receipt by implication contains a contract requiring an affirmative act on the part of Beaunisne (namely, to secure and deliver to appellee within a reasonable time stock of the par value of five thousand dollars), it could neither be contradicted nor explained nor varied by parol evidence. (It was stipulated that objections to the materiality and probative force of facts stated in the statement of facts might be made by either party.)

To this point appellee's counsel cites in argument many authorities which he deems in point. That the court below did not hold this view would seem to be indicated by its holding this proposition of law, with which we are in accord.

"The Court holds as a matter of law that the receipt set out in the stipulation of facts herein is not the contract, nor does it contain or purport to contain all the terms of the contract or agreement between the claimant and the decedent herein, but that said receipt is only evidentiary of the agreement under which said claimant subscribed the sum of money herein mentioned, and that whatever evidence is contained in the stipulation of facts and the testimony of the witness Ballou and of said claimant, bearing on the understanding and agreement of the claimant and decedent in regard to the purposes for which said money was invested and for which it was to be used, may properly be considered by the Court in determining what was the real contract between the parties."

We cannot, from all the evidence submitted in this cause taken together, come to any other conclusion than that the appellee was a fellow-adventurer of Beaunisne and his associates in a speculative enterprise; that he knew or should have reasonably inferred from all the circumstances and from the nature of the transaction that the purpose for which his money was to be used was the purpose for which it was used,—the tentative and preliminary work in an enterprise in which Beaunisne and he stood, neither in the relation of "vendor and vendee," as the stipulation puts it, nor in the relation of those who have respectively contracted for the delivery and reception within a short or limited time, of stock in a corporation definitely provided for.

The court below, however, although holding that the "real contract" might be proved, seems not to have taken this view that it was proved to be what we have described. It seems rather to have held that the evidence taken together still showed the contract to be one

for the delivery, irrespective of adverse contingencies, of stock in a described corporation within a reasonable time.

If we should decide this appeal on this same assumption concerning the contract, we nevertheless could not reach the further conclusion of the Circuit Court that the tender of the stock on October 26, 1906, was not, under all the circumstances of the case, within a reasonable time.

Extrinsic evidence was competent, we hold (agreeing with the court below in this) to show what the real contract was. It was as competent and material on the question of within what time the stock must be delivered as on any other of the terms of the contract.

The court, we think, should have held, not refused, the propositions of law tendered, which said in effect that all the circumstances connected with the development of the railroad enterprise shown by the stipulation and evidence should be taken into consideration in determining whether the stock was tendered within a reasonable time. The length of time in which the mere technical organization of a corporation could be completed has very little to do with the question. In a speculative, uncertain adventure of this kind, to be financed as this was and as the appellee knew or should reasonably have known it must be, it was of the last importance that nothing premature in the more formal and technical part of the scheme should interfere with the flotation of the bonds on which its possible success was to rest. It was for this reason apparently that the filing of corporate organization papers was delayed. The delay was of no prejudice to the appellee. The cause of his loss was not the delay in organizing the corporation, but the disappointing failure of the London financial agent of the "syndicate" or "Committee of Organization" to secure the underwriting of the bonds, the negotiation of which was necessary to the success of the enterprise. Had the corporation been organized three years earlier, the material result

to the appellee would have been the same. That during three years efforts were made to place the bonds, is a part of the stipulation. That the "Committee" of which Beaunisne was treasurer acted in good faith and with reasonable effort in the matter, we think is a fair inference from all the facts shown. Their own money to a greater extent than that of their fellow-adventurer Scholz was involved.

It is unnecessary for us formally to decide whether the second "demand" of Scholz on Beaunisne was a waiver of the first, because we do not hold that the first demand was one with which Beaunisne was under obligation to comply, but we may say that it would seem very hard to escape from the conclusion that the second demand framed apparently on a different theory of Scholz' rights than the first, waived and superseded it, and that if, under the construction of the "contract" adopted by the court below, it was necessary within "a reasonable time" to make a tender of stock, "a reasonable time" would have to be calculated from that second demand. Notwithstanding the use of the term "forthwith" in it, we think that three months from the expressed ultimatum was "a reasonable time" under the circumstances.

Our view of the law as applied to the facts of this case requires us to reverse the judgment of the Circuit Court, and to give the judgment here which we think the Circuit Court should have given,—that the plaintiff should take nothing by his action and the defendant recover her costs.

*Reversed and judgment here.*